UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
DOUGLAS STEWART WHITE,

                 Plaintiff,             <u>MEMORANDUM & ORDER</u>
                                                15-CV-1035(JS)(JMW)

     -against-

ROOSEVELT UNION FREE SCHOOL DISTRICT
BOARD OF EDUCATION,

                 Defendants.
--------------------------------x

For Plaintiff:     Douglas Stewart White, <u>Pro Se</u>
                   989 Clinton Place
                   Baldwin, New York  11510

For Defendants:     Gerald Stephen Smith, Esq.
                   Silverman & Associates
                   445 Hamilton Avenue, Suite 1102
                   White Plains, New York  10601

SEYBERT, District Judge:

        <u>Pro se</u> Plaintiff, Douglas Stewart White ("Plaintiff" or "White"), commenced this action against Defendant, the Roosevelt Union Free School District Board of Education (the "Defendant" or the "Board of Ed."), alleging claims of discrimination, retaliation, and hostile work environment on the basis of race, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>, 42 U.S.C. § 1981 ("Section 1981"), and 42 U.S.C. § 1983 ("Section 1983").

        Presently before the Court are the Parties' cross-motions for summary judgment. (<u>See</u> Def. Motion, ECF No. 116; Pl. Cross-Motion, ECF No. 120.)  For the reasons that follow,

1

Defendant's Motion is GRANTED, and Plaintiff's Cross-Motion is DENIED.

BACKGROUND

I.   Procedural History

On February 24, 2015, Plaintiff filed his initial Complaint alleging claims for failure to accommodate, unequal terms and conditions, retaliation, and hostile work environment pursuant to Title VII and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112 et seq. (See Compl., ECF No. 1.) On September 8, 2016, the Court granted Defendant's motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and granted Plaintiff leave to amend. (See Dismissal Motion, ECF No. 33.) Subsequently, on January 9, 2017, Plaintiff filed his Amended Complaint alleging claims pursuant to Title VII and Section 1981. (See Amend. Compl., ECF No. 35.)

On June 15, 2021, Defendant filed a motion for summary judgment. (See ECF No. 93.) On February 28, 2022, Plaintiff opposed the motion and cross-moved for summary judgment. (See ECF No. 105.) On July 10, 2023, the Court denied both motions without prejudice and with leave to re-file, due to Defendant's failure to serve Plaintiff the required pro se notice pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Eastern Districts of New York ("Local Rule") 56.2 (hereafter, the "Prior SJ Order"). (See ECF No. 110.)

2

On November 2, 2023, Defendant filed a fully briefed Motion for Summary Judgment (the "Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure, (see ECF No. 116; see also Support Memo, ECF No. 117); as the moving party, the Defendant also filed Plaintiff's omnibus opposition to Defendant's Motion and cross-motion for summary judgment (the "Cross-Motion") (see Pl.'s Opp'n, ECF No. 120), as well as its Reply in further support of its Motion and in opposition to Plaintiff's Cross-Motion (see Reply, ECF No. 122), among other related filings.

## II. Factual History[1]

### A. Materials Considered

Local Rule 56.1 requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). If the opponent disputes a fact, it must respond to the purportedly undisputed fact and cite to admissible evidence in the record to support said purported dispute. See Local Rule 56.1(b),(d); Fed. R. Civ. P. 56(c). The movant's asserted facts are deemed to be admitted unless specifically controverted by a

---

[1] The following facts are drawn from: the parties' Local Rule 56.1 Statements, Responses, and Counterstatements; corresponding supporting evidence; and the Court's independent review of the record. (See Def. 56.1 Stmt., ECF No. 76; Pl. 56.1 Response, ECF No. 89 at ECF pp.8-71; Pl. 56.1 Counter-Stmt., ECF No. 89 at ECF pp. 71-83; Def. 56.1 Counter-Stmt., ECF No. 123.)

correspondingly numbered paragraph in the responding statement required to be served by the opposing party.  See Local Rule. 56.1(c); see also Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); F.D.I.C. v. Hodge, 50 F. Supp. 3d 327, 343 n.2 (E.D.N.Y. 2014) ("Statements without citation to evidence may be properly ignored by the court."); Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no [] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (citations omitted)). "Additionally, to the extent [a party's Rule] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,'" the Court may disregard such statements.  McFarlance v. Harry's Nurses Registry, No. 17-CV-6360, 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting Risco v. McHugh, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).  Pro se litigants are "not excused from meeting the requirements of Local Rule 56.1." Wall v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); Manolis v. Brecher, No. 11-CV-2750, 2014 WL 642849, at *3 (S.D.N.Y. Feb. 14, 2014)

("[Plaintiff's] status as a <u>pro se</u> litigant does not relieve her of the duty of complying with federal and local rules" and "the special solicitude frequently afforded to <u>pro se</u> litigants does not excuse [a plaintiff's] failure to comply with the requirements of Local Rule 56.1.").

"Although in ruling on a motion for summary judgment a court must assess the evidence in the light most favorable to the non-moving party, resolve all ambiguities, and draw all reasonable inferences in his favor, . . . the non-moving party cannot rely on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative and specific evidence . . . . [A] court will not entertain inadmissible hearsay unsubstantiated by any other evidence on ruling on a summary judgment motion." <u>Mattera v. JPMorgan Chase Corp</u>, 740 F. Supp. 2d at 566 n.2 (S.D.N.Y. 2010) (internal quotation marks and citations omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" <u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 843 (2d Cir. 2013) (quoting <u>Anderson</u>, 477 U.S. at 248)).

In the instant case, Plaintiff purports to dispute facts recited in Defendant's Local Rule 56.1 Statement, but in many cases, he either fails to identify the grounds for disputing the

facts or he fails to point to admissible evidence or affidavits that provide a basis for any such dispute. (See, e.g., Pl. 56.1 Response ¶¶ 6, 9, 13, 19, 26, 31, 37, 40, 48, 55-57, 65, 70-72, 77-78, 98-99, 103, 130, 142, 144-45, 156, 176-79, 181, 186-88, 190-99, 200-02, 210-12, 214-16; Pl. 56.1 Counter-Stmt. ¶¶ 220, 226-27, 291, 302, 304, 308.) This is insufficient.[2] Accordingly, any of Defendant's Rule 56.1 Statements that are properly supported, but which Plaintiff does not specifically deny with requisite citations to admissible evidence, are deemed admitted

---

[2]  Notably, in its Prior SJ Order, the Court cautioned Plaintiff "that many of Plaintiff's [Rule 56.1] responses lack the requisite citations to admissible evidence." (Prior SJ Order at 6.) The Court explained, "[n]otwithstanding the fact that Plaintiff submitted opposition to Defendant's Motion and a Cross-Motion, much of the evidence upon which Plaintiff relied is either inadmissible or is not presented in an admissible format." (Id. at 5-6.) Further, the Court explained "[t]he notarized letters submitted by Plaintiff are inadmissible as they are neither presented in affidavit format nor are they sworn to under penalties of perjury. . . . Similarly, to the extent Plaintiff intended to rely upon witness statements presented in the form of audio and/or video recordings, these too would be inadmissible for the same reasons." (Id. at 6, n.2.) Though it appears that Plaintiff partially complied with the Court's instructions by attaching three affidavits sworn to under penalty of perjury, (see ECF Nos. 119-1 through 119-3), much of his evidence in the form of audio and video recordings remains in inadmissible form. (See ECF No. 119, Flash Drive B.)

The Court further advised Plaintiff that if he required assistance in properly responding to a renewed summary judgment motion, he could contact the Hofstra University Pro Se Legal Assistance Program located within the Central Islip Courthouse, which he did. (Id. at 8, n.3; see also Pl.'s Oct. 2, 2023 Letter Motion, ECF No. 113 (requesting an extension of time to file opposition papers, noting Plaintiff was working with the Hofstra University Pro Se Legal Assistance Program).)

for purposes of Defendant's summary judgment motion.  <u>See</u> Local Civ. R. 56.1(c); <u>see also, e.g.,</u> <u>Butler v. Suffolk County</u>, No. 11-CV-2602, 2023 WL 5096218, at *19-20 (E.D.N.Y. Aug. 9, 2023) (discussing requirements of Rule 56.1 statements, including that such statements must specifically cite to admissible evidence to controvert a purported statement of undisputed fact). Nevertheless, the uncontroverted facts will still be viewed in a light most favorable to Plaintiff.

    B.   <u>Factual Background</u>

       1.   <u>Generally</u>

     Plaintiff, a Caucasian, tenured English teacher has been employed by the Roosevelt Union Free School District ("the District") since 2000, teaching both middle school and high school students.  (Def. 56.1 Stmt. ¶ 1; Sept. 22, 2016 N.Y.S. Div. of Human Rights Decision & Order ("NYSDHR 2016 Decision"), ECF No. 118-36 at 2; Amend. Compl. ¶ 5.)  According to Plaintiff, since he began his employment in the District, the students have presented challenging behavior, and the administration provided insufficient disciplinary measures.  (Def. 56.1 Stmt. ¶ 48; Pl. 56.1 Response ¶¶ 47, 48.)  Plaintiff attributed the discipline issues in the school to: the "very large" foster care population; the "very high" special education component of the student population; and, the lack of discipline in the school.  (Def. 56.1 Stmt. ¶ 47; Pl. 56.1 Response ¶ 47.)  According to Plaintiff, there were times, after

he had students removed from class for behavioral issues, that those students would then accuse him of picking on them because of their race.  (Def. 56.1 Stmt. ¶ 46.)

2.    Superintendent Ronald Ross ("Superintendent Ross")

Sometime in the 2005-2006 academic year, after Plaintiff spoke out at a faculty meeting against Superintendent Ross's "racist rants against white teachers," then-Superintendent Ross, who is Black, assigned Plaintiff to a "rubber room".  (Def. 56.1 Stmt. ¶ 3; Pl. 56.1 Response ¶¶ 2, 5; Amend. Compl. ¶ 7.)  According to Plaintiff, teachers were assigned to the "rubber room" due to disagreements they had with the school's administration or because they were "ethnically diverse."  (Def. 56.1 Stmt. ¶ 5; Pl. 56.1 Response ¶¶ 3, 5.)  At the time Plaintiff was assigned to the "rubber room," it was shared with six teachers, including: one "Black woman"; a "European fellow"; an individual with a "thick Chinese accent"; and. an "Italian woman".  (Pl. 56.1 Response ¶ 3; Def. 56.1 ¶ 4.)

In March 2006, during Superintendent Ross's tenure, Plaintiff and a few other teachers brought the District to arbitration for violating their union contract by hiring someone outside the District to teach summer school in 2005.  (Def. 56.1 Stmt. ¶6; Pl. Response ¶¶ 5, 6, 7.)  Plaintiff further contends, at some point during Superintendent Ross's tenure, Assistant Principal Michael Jones ("Jones") told White that Superintendent

Ross directed Jones to "go after white teachers". (Pl. 56.1 Response ¶ 10; Def. 56.1 Stmt. ¶ 11.) Plaintiff is unsure when Superintendent Ross left the District, but it was sometime between 2006 and 2008. (Pl. 56.1 Response ¶ 13.)

### 3. Principal Steven Strachan ("Strachan")

In 2010, Strachan, who is Black, became Principal of the District's high school. (Id. ¶ 14.) Prior to Strachan's arrival, Plaintiff had managed the high school's drama club. (Id. ¶ 16.) According to Plaintiff, the drama club was not as successful as he would have liked because the students were not really interested; they would come to drama club, take snacks, and then wander the halls. (Def. 56.1 Stmt. ¶ 17.) When Strachan became Principal, he repeatedly asked if White would manage the drama club again. (Pl. 56.1 Response ¶ 18.) After initially declining, Plaintiff agreed and was approved to run the drama club in late October 2010. (Id. ¶¶ 18, 19.) Plaintiff received a stipend for his position with the drama club. (Def. 56.1 ¶ 28.) Shortly thereafter, Strachan informed Plaintiff that he (Strachan) wanted the drama club to produce a Christmas show. (Id. ¶ 21.) According to Plaintiff, Strachan "wanted [White] to fail" and sent two Black administrators, Assistant Principal Trevor Patton ("Patton") and Assistant Principal Carey Grey ("Grey"), to disrupt and recast the show. (Def. 56.1 Stmt. ¶ 26; Pl. 56.1 Response ¶ 25; Pl. Dep. Tr., ECF No. 118-3, 47:2-48:10; 50:10-12.) Plaintiff received

9

contradictory directions from Patton and believes that, while he should have been appointed an assistant to help him manage the drama club, one was never appointed.  (Def. 56.1 Stmt. ¶ 27.) According to Plaintiff, Patton: had a reputation for being loud and yelling at students (Pl. 56.1 Response ¶ 31); and, yelled at Plaintiff during a rehearsal because the students were roaming the hallways and because she felt pressure from a State visit.[3] (Id. ¶¶ 30-32; Def. 56.1 Stmt. ¶¶ 30-32.)  Then, during the Christmas show, the microphones were turned off; Plaintiff believes this was done on purpose.  (Pl. 56.1 Response ¶¶ 33-34. Def. 56.1 Stmt.¶¶ 33-34.)

In a February 4, 2011 memorandum, Plaintiff was notified Strachan was recommending to the Assistant Superintendent of Human Resources that White be removed as drama club advisor for failing to comply with Strachan's requests, recommendations, and directives regarding managing and coordinating the music and drama program at Roosevelt High School. (See Pl. Disc A, Book 4-017-18.) According to Plaintiff, Strachan did not care for White for various reasons, including: White's students complained to Strachan that White was recording them in the classroom; and, White spoke out against a new program Strachan was promoting at the school.  (Pl.

---

[3]  At that time, the District was under the control of the State. (Pl. Dep. Tr. 52:17-23.)

56.1 Response ¶¶ 23, 24.)  Plaintiff also claims Strachan did not discipline students that disrupted White's class.  (<u>Id.</u> ¶ 107.)

### 4.  The December 2011 Candy Incident

On December 9, 2011, the students in Plaintiff's sixth period English class were unusually disorderly, and Plaintiff was having difficulty getting them to settle down and begin their work. (Def. 56.1 Stmt. ¶¶ 109-10.)  One student was giving out candy to the other students in Plaintiff's class, including C.V.  (<u>Id.</u> ¶ 111.)  Plaintiff told C.V. and the other students there was no eating in class and to put the candy away.  (Pl. 56.1 Response ¶ 112.)  C.V. failed to comply.  (<u>Id.</u> ¶ 113.)  It is disputed as to what happened next.  According to C.V., Plaintiff approached her and attempted to forcibly take her candy away; C.V. then swatted Plaintiff's hand away.  (<u>Id.</u> ¶¶ 115, 117.)  According to Plaintiff, he never grabbed for C.V.'s candy; rather, he put out his hand, gesturing for her to surrender the candy.  (<u>Id.</u> ¶ 116.)  However, C.V. then punched him in the shoulder; where after, he restrained her from hitting him to protect himself.  (<u>Id.</u> ¶¶ 117-18.)  Both C.V. and Plaintiff agreed that a physical struggle ensued during which C.V. felt a sting on her face leading her to believe she had been hit by Plaintiff.  (Def. 56.1 Stmt. ¶ 119-20.)  At some point, security was called into Plaintiff's room and C.V. was escorted to the main office to discuss the incident with administrators,

11

including Assistant Principals John Finch ("Finch"), Grey, Patton, as well as Strachan.  (Id. ¶ 128.)

Thereafter, C.V. submitted a written statement; additionally, the students who were in the class when the incident occurred were interviewed and had an opportunity to submit written statements about their respective recollections of the incident. (Id. ¶¶ 130-31.)  According to Plaintiff, C.V. was "coaching her friends what to write."  (Pl. 56.1 Response ¶ 131.)  While the students' responses differed on the question of whether Plaintiff had struck C.V., they acknowledged White tried to physically take the candy away from C.V.  (Def. 56.1 Stmt. ¶ 132-33.)

For his part, White provided a written statement about the incident to his union representative, Mary Viviani ("Viviani"); in it, he acknowledged he put his hands up to indicate to C.V. that he intended to take the candy from her.  (Id. ¶¶ 134-36.)  Thereafter, Plaintiff and Viviani met with Strachan, Grey, and Finch in Strachan's office. (Id. ¶ 137.)  It is disputed whether Patton was also present at the meeting.  (Pl. 56.1 Response ¶ 137.)  Plaintiff denied hitting C.V.  (Def. 56.1 Stmt. ¶ 143.) According to White, C.V. hit him in the shoulder, causing injury to an old wound, which injury required surgery.  (Id. ¶ 142.) According to Defendant, during the meeting, Strachan: directed Plaintiff not to discuss the incident with anyone; directed Plaintiff not to have any contact with C.V.; and, informed

12

Plaintiff that C.V. would be removed from White's class.  (Id. ¶ 148.)  Plaintiff denies he was given the directive not to discuss the incident with C.V.  (Pl. 56.1 Response ¶ 148.)  On December 12, 2011, Plaintiff informed Viviani that C.V. came into his classroom and that C.V. was still on his class roster.  (Def. 56.1 Stmt. ¶¶ 157, 159.)  Viviani reported this to Strachan, who informed Viviani that he would have C.V.'s schedule changed.  (Id. ¶¶ 158-59, 161.)  According to Plaintiff, C.V.: was not removed from his roster until a week after the incident; and, continued to harass him, as well as another teacher.[4]  (Pl. 56.1 Counter-Stmt. ¶ 276.)

5.    The Candy Incident Statement

During her lunch period on December 13, 2011, C.V. passed Plaintiff's classroom with a friend.  (Def. 56.1 Stmt. ¶ 163.)  It is disputed whether, at that time, C.V. entered White's classroom on her own or whether Plaintiff called C.V. into his classroom.  (Id. ¶ 164; Pl. 56.1 Response ¶ 164.)  Regardless, Plaintiff provided C.V. with a written statement he claims the Administration asked him to write up about the candy-related incident (hereafter, the "Candy Incident Statement").  (Def. 56.1 Stmt. ¶ 166.)

---

[4] According to Plaintiff's evidence, on December 15, 2011, C.V. received a one-day suspension to take place on December 16, 2011 for "engaging in physically aggressive behavior" towards a teacher.  (Pl. Ex. 17).  C.V.'s suspension was extended to five days, commencing December 19 through January 3, 2012.  (Pl. Ex. 22 at 18-19.)

Included in the Candy Incident Statement were statements that: (a) C.V. hit Plaintiff after he put his hand up as if he was going to take away the candy from her (id. ¶ 167); (b) C.V. wanted to fight White; (c) C.V. chased White after he took the candy away from her; (d) C.V. felt badly about the incident; and (e) C.V. had apologized to White for the incident and that she loves White. (Id.) Plaintiff instructed C.V. to read and sign the Candy Incident Statement, which she skimmed and signed because she was told by Plaintiff that the Administration wanted C.V. to sign it. (Id. ¶¶ 168-69.) Plaintiff called security guard Kevin Boutin into the room to witness C.V. sign it, which C.V. did. (Id. ¶ 170.)

Though disputed when and how, at some point after C.V. signed the Candy Incident Statement, she wound up in Strahan's office and informed him about said Statement and having signed it. (Id. ¶¶ 172-75.) During a subsequent meeting Strahan had with Plaintiff, Plaintiff admitted he had C.V. sign the Candy Incident statement and that he did not see anything wrong with it. (Id. ¶ 176.) Strachan questioned why Plaintiff defied the directive not to have contact with C.V. (id.), but Plaintiff denied Strahan had given him this instruction. (Pl. 56.1 Response ¶¶ 177-78.) Plaintiff admits, after having C.V. sign the Candy Incident Statement, Strachan instructed White not to have further contact with C.V. (Id. ¶ 180.)

14

6.    Plaintiff's Suspension

Subsequently, the Interim Assistant Superintendent for Human Resources, Ronal Grotsky, put Plaintiff on administrative leave pending the outcome of an investigation. (Def. 56.1 Stmt. ¶ 181.)  On February 16, 2012, having found probable cause, the Board of Ed. voted to bring misconduct charges against Plaintiff pursuant to Education Law Section 3020-a. (Id. ¶ 185.)  Plaintiff rejected the District's offer of a two-week suspension in exchange for a waiver of a Section 3020-a hearing. (Id. ¶ 186; Pl. 56.1 Response ¶ 187.)  Plaintiff believed the District had brought charges against him because, as a senior English teacher, he commanded the highest salary in the English Department. (Def. 56.1 Stmt. ¶ 188 (citing a May 30, 2014 letter Plaintiff wrote to his insurer regarding the District's charges against him).)  Subsequently, a hearing took place; it was for nine days spread out between September 2012 and February 2013. (Id. ¶ 189; Def. Ex. 26, ECF No. 118-26.)  In a June 10, 2013 decision, the Hearing Officer found Plaintiff engaged in "conduct unbecoming a teacher"; this finding was based upon White having placed his hands on C.V. in an attempt to take candy from her even though alternative methods existed to resolve the situation. (Def. 56.1 Stmt. ¶ 190.)  The Hearing Officer also found Plaintiff engaged in misconduct and "insubordination" when he disregarded instructions not to have contact with C.V. and, instead, engaged in a discussion with her

about the candy incident and then had her sign the Candy Incident
Statement, in which prepared statement C.V. purported to recant
those allegations. (Id. ¶ 192.)  Ultimately, because White was a
popular, long-term teacher with an otherwise good record, the
Hearing Officer refused to terminate him or suspend him without
pay for six months; instead, White was suspended without pay for
40 days. (Id. ¶ 193; Def. Ex. KK at 3.)[5]

       7.   The Suspension Appeal

Plaintiff subsequently appealed the Hearing Officer's
decision to the State Supreme Court. (Def. 56.1 Stmt. ¶ 194.)  On
February 24, 2014, the Supreme Court denied White's petition, which
he then appealed to the Second Department. (Id. ¶¶ 194-95.)  In
a 2017 decision, the Second Department upheld the portion of the
Hearing Officer's decision that found White engaged in conduct
unbecoming a teacher regarding his physical confrontation with
C.V. (Id. ¶¶ 195-97.) ("[T]here was a rational basis and
evidentiary support for the finding that the [Plaintiff] committed
conduct unbecoming a teacher by inappropriately attempting to grab
candy away from a student in his class.") (citing White v.
Roosevelt Union Free Sch. Dist. Bd. of Educ., 147 A.D.3d 1071,
1072 (2d Dep't. Feb. 22, 2017). However, the appellate court also

---

[5]  When he was first suspended, the Board of Ed. rejected
Plaintiff's offer to sacrifice 40 paid sick days in exchange for
the repeal of his 40-day suspension. (Def. 56.1 Stmt. ¶ 200;
NYSDHR 2016 Decision at 3.)

found, despite the arbitrator having found White "did put his hands on a student as a result of his attempting to take candy from the student in his class, the testimony did not reflect that, in his attempt to physically grab the candy from the student, the petitioner put his hands on the student's person." White, A.D.3d at 1073 (internal quotation and citation omitted). Additionally, the appellate court held "there is a rational basis and evidentiary support for the arbitrator's finding that [White] committed conduct unbecoming a teacher and was insubordinate by directing the subject student to sign a prepared statement recanting the allegations." (Id.) However, the appellate court also found:

> the evidence did not support the arbitrator's finding that the petitioner committed conduct unbecoming a teacher and was insubordinate by otherwise discussing with the subject student the allegations made against him by that student. . . . [A]lthough the testimony at the hearing established that the petitioner was directed not to have contact with the student pending investigation of the incident involving the candy, the student was not immediately removed from the petitioner's class roster, despite the petitioner's request that this be done.

Id.

Ultimately, while the Second Department vacated the Hearing Officer's determination with respect to a number of the charges, it maintained the determination that Plaintiff was guilty of: misconduct by inappropriately attempting to grab candy away from C.V.; and, misconduct and insubordination in directing the

student to sign the Candy Incident Statement, thereby recanting her allegations. (See Dec. 5, 2017 Am. Award & Decision, ECF No. 118-29.) On remand, the Hearing Officer determined Plaintiff's suspension should be reduced to 12 days and Plaintiff should receive 30 days' back pay, as well as any benefits lost due to the original suspension. (Id.)

### 8. Incidents Post-Suspension

#### a. The March 12 Fake Fight

According to Plaintiff, C.V. continued to harass him; additionally, C.V.'s boyfriend staged a fake fight in White's classroom on March 12, 2012, during which Plaintiff suffered an injury. (Pl. 56.1 Counter-Stmt. ¶¶ 256-58.) Plaintiff claims, despite requesting C.V.'s boyfriend be removed from White's class, Strachan kept the student on White's roster and never suspended him. (Id. ¶ 259; Disc A, Book 3 at 154.) As a result of the March 12 altercation, Plaintiff filed a workers' compensation claim for the injury he sustained and began receiving benefits. (NYSDHR 2016 Decision at 2.)

#### b. A Student is Permitted to Go To the Cafeteria

Pursuant to a September 14, 2012 internal memorandum from Patton to Plaintiff, a student informed Patton that Plaintiff allowed the student to go to the cafeteria during class. (Pl. Disc A, Book 4-034.) As a result, Plaintiff was verbally reprimanded by Patton and Strachan. Plaintiff denied he had

18

allowed that to occur; instead, he speculated a push-in teacher may have permitted the student to do so. Therefore, Plaintiff requested Patton remove the note from White's file. (Id. Book 4-035-36; see also Extra Evid. Book, Ex. 8, ECF No. 89, at 80.)

### c. White's 2013-2014 Class Schedule

Plaintiff's class schedule for the 2013-2014 school year originally assigned him to three classes in the high school. (NYSDHR 2016 Decision at 4.) However, when Plaintiff returned from his suspension in November 2013, he was assigned only one class in the high school. (Id.) A week later, Plaintiff was assigned to temporarily teach Jeffrey Littwin's class in the high school and Leo McCray's Greek mythology class in the middle school, when neither one of them was absent. (Id.) Though his salary and benefits did not change, Plaintiff believed the substitution was "a bit of a demotion." (Id.) As a result of the additional teaching assignment, while having to carry bags and books, Plaintiff was forced to travel between the high school and the middle school twice a day or every other day. (Id. at 4-5.) Moreover, like substitute teachers, Plaintiff was unable to access the computers in the middle school to enter student progress notes; therefore, he was instructed to hand write his entries for someone else to enter his notes in the middle school's computer system. (Id.) Additionally, Plaintiff contends, pursuant to Strachan's direction, White was denied keys to the middle school classroom

19

and restroom where he was substitute teaching for weeks.  (Pl.'s 56.1 Response ¶ 104.)

      d.   <u>Interactions with Other Teachers and Staff</u>

According to Plaintiff, following his Section 3020-a hearing, teachers were less friendly to White.  (Def. 56.1 Stmt. ¶ 86.)  For example, a white teacher, Melissa Mohan, cursed and yelled at Plaintiff after he raised questions about who had graded a student's test.  (<u>Id.</u> ¶¶ 73-74.)  Mr. Block, a white teacher, stated to White, "Think about it[;] your name is an insult around here."  (<u>Id.</u> ¶¶ 75, 76.)  A Black teacher, Mr. Konate Lilas ("Lilas"), called Plaintiff an "asshole" and referred to him as "white man."  (Pl. 56.1 Counter-Stmt. ¶ 87; Pl. Dep. Tr. 125:8-12.)  Additionally, Plaintiff claims security guards, whom he saw on a sporadic basis referred to him as "Whitey" and "Mr. White", "my white 'N' word", and "white man"; they would also say to Plaintiff: "yo, N-word." (Def. Stmt. 56.1 ¶¶ 59, Pl. Dep. Tr. 61-62;66-68.)

      9.   <u>Plaintiff's Experiences After Strachan Departs</u>

Strachan left the District in the Fall of 2014.  (Pl. Dep. Tr. 156:8-9.)  In November 2014, Farnum, who had been the assistant principal, became Principal.  (Pl. 56.1 Counter-Stmt. ¶ 103.)  According to Plaintiff, while Principal, Farnum never took any actions against White due to his race. (Pl. 56.1 Response ¶ 104.)

Following Mr. Farnum's departure, Ms. Patton briefly served as Principal. (Def. 56.1 Stmt. ¶ 105.) According to Plaintiff, as Principal, Patton harassed White on issues with which she did not harass Black employees. (Pl. 56.1 Response ¶ 105.)

Brodrick Spencer ("Spencer"), a Black assistant principal under Principal Ross (Pl. Dep. Tr. 171:2-4), became acting Principal of the high school in 2017. (Id. 173:11-21; 88:20-22.) Plaintiff contends he never heard Spencer say anything about Plaintiff's race. (Id. 166:9-15.)

10. Plaintiff's Evaluations

Plaintiff's evaluations from 2003 through 2020, prepared by different administrators, varied; for example:

    a. On June 25, 2003, Plaintiff received a "satisfactory" evaluation from Assistant Principal J. West, who indicated Plaintiff needed to improve in the area of classroom management. (Def. 56.1 Stmt. ¶ 100 (citing ECF No. 118-14));

    b. In 2006, Plaintiff received an "unsatisfactory" evaluation from Spencer noting White had been asleep at his desk when Spencer entered the classroom and was subsequently unable to locate one of his students without the assistance of security. (Id. ¶ 101; ECF No. 120, Ex. C, at 47);

    c. On June 26, 2008, Plaintiff received an evaluation of "needs improvement" from Principal Favth Vaughn-Shavuo, noting Plaintiff needed to consistently enforce the discipline code. (Def. 56.1 Stmt. ¶¶ 102; ECF No. 118-15);

d.   In December 2013, Plaintiff received an "unsatisfactory" evaluation after the middle school principal, Nateasha McVea, and assistant principal, Ogechi Iwuoha, observed Plaintiff's class. (NYSDHR 2016 Decision at 6);

e.   On June 13, 2015, Farnum gave Plaintiff an observation rating of "effective." (Def. 56.1 Stmt. ¶ 92; ECF No. 118-12.)  Mr. Farnum also provided Plaintiff with a "glowing" reference letter on June 5, 2015.  (Def. 56.1 Stmt. ¶ 94; ECF No. 118-13);

f.   In 2019, in an observation report, Plaintiff received the second highest possible rating of "effective" from Assistant Principal Lisa Pachitti. (Def. 56.1 Stmt. ¶ 88 (citing Oct. 24, 2019 observation report). Conversely, in his 2019 observation report of Plaintiff, Spencer assigned Plaintiff a rating of "ineffective and developing." (Pl. 56.1 Response ¶ 95); and

g.   In 2020, Plaintiff was observed by the Superintendent, who rated Plaintiff as "effective." (Def. 56.1 Stmt. ¶ 90.)

11.  Plaintiff's NYSDHR Complaints

On December 28, 2012, Plaintiff filed a complaint with the NYSDHR alleging he had been discriminated against and the District had retaliated against him. (NYSDHR 2016 Decision at 3.) On November 28, 2014, the NYSDHR dismissed Plaintiff's claims. Subsequently, on December 11, 2014, Plaintiff received a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"). (Id.)

22

On July 29, 2014, Plaintiff filed a second complaint with the NYSDHR alleging discrimination based upon age and disability, and retaliation for his having filed his prior discrimination complaint with the NYSDHR. (Id. at 1.) On November 22, 2016, the NYSDHR dismissed Plaintiff's discrimination claims finding Plaintiff failed to establish that being assigned to a single classroom or a single school building was necessary to accommodate his shoulder injury and failed to demonstrate he was otherwise discriminated against due to his age or disability. (Id. at 9; see also NYSDHR Nov. 22, 2016 Notice & Final Order, ECF No. 118-37.) With respect to Plaintiff's retaliation claim, the NYSDHR found the District provided legitimate nondiscriminatory reasons for its actions; specifically, Plaintiff had been suspended pursuant to an arbitrator's decision and Plaintiff's assignment to teach in both the middle school and high school was temporary, and during which time he retained his salary and benefits. (NYSDHR 2016 Decision at 10.) Additionally, the NYSDHR found, upon reassignment to the middle school, though Plaintiff was not initially provided with a key to access the middle school classroom or bathroom, he was eventually provided a key, which occurred within a reasonable time of his request; therefore, Plaintiff did not suffer retaliation. (Id.) Finally, the NYSDHR rejected Plaintiff's retaliation claim based upon his having to handwrite progress report notes rather than providing him with access to the

23

middle school's computer system; it found no retaliation since all other teachers without access to the computer system were required to do the same as Plaintiff.  (Id. at 10-11.)

DISCUSSION

I.    The Summary Judgment Standard

Pursuant to Rule 56(a), "[a] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law."  Adamson v. Miller, 808 F. App'x 14, 16 (2d Cir. 2020).  Additionally, "'[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Id. (quoting Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005)).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997).  Moreover, "the court is not to make assessments of the credibility of witnesses" on a motion for summary judgment, as "[c]redibility assessments, choices between conflicting versions of events, and weighing of the evidence are matters for the jury."  Id.

24

On a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).  In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vardaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).  When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1318 (2d Cir. 1990)).

"Once the movant has 'demonstrat[ed] the absence of a genuine issue of material fact . . . the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim.'" Pennington v. D'Ippolito, 855 F. App'x 779, 781 (2d Cir. 2021) (alteration in original) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)). To do this, "[t]he non-moving party is required to 'go beyond the

pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" Id.

"The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief." Coutard v. Mun. Credit Union, 848 F.3d 102, 114 (2d. Cir. 2017). Instead, "'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Id. (quoting Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

The Court notes that, "particularly where motions for summary judgment are concerned," Jackson v. Fed. Express, 766 F.3d 189, 195 (2d Cir. 2014), it is "obligated to afford a special solicitude to pro se litigants." Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010). Nevertheless, pro se litigants are "generally . . . required to inform themselves regarding procedural rules and to comply with them." Wilson v. Suffolk County Dist. Att'y, No. 21-CV-4815, 2021 WL 4311155, at *2 (E.D.N.Y. Sept. 22, 2021) (quoting Caidor v. Onondaga County, 517 F.3d 601, 605 (2d Cir. 2008)).


[Remainder of page intentionally left blank.]

II.  Defendant's Summary Judgment Motion re: Plaintiff's Claims

     A.  The Title VII Claims

          "Title VII provides, in relevant part, that '[i]t shall
be an unlawful employment practice for an employer' to take adverse
action against an employee because of that employee's 'race, color,
religion, sex, or national origin.'"  Village of Freeport v.
Barrella, 814 F.3d 594, 606 (2d Cir. 2016) (quoting 42 U.S.C.
§2000e-2(a)).  Pursuant to Title VII and based upon his race, i.e.,
being Caucasian, Plaintiff alleges claims of discrimination,
hostile work environment, and retaliation.

          1.  The Discrimination Claim

          The anti-discrimination provision of Title VII forbids
employers from "discriminat[ing] against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's . . . race." 42 U.S.C.
§ 2000e-2 (a)(1).  Employment discrimination claims are analyzed
under the burden-shifting framework the Supreme Court established
in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See
Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010);
Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008).  That
framework requires a plaintiff to first establish a prima facie
case of discrimination.  Holcomb, 521 F.3d at 138.  To establish
a prima facie case of discrimination, a plaintiff must show: "(1)
he is a member of a protected class; (2) he was qualified for the

27

position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012) (quoting Ruiz, 609 F.3d at 491–92).

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Holcomb, 521 F.3d at 138. Once the defendant employer provides such a reason,

> the presumption of discrimination is rebutted and it simply drops out of the picture. The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that a reasonable jury could conclude that more likely than not the employer's actions were motivated, at least in part, by a discriminatory reason.

Baffa v. STAT Health Immediate Med. Care, P.C., No. 11-CV-4709, 2013 WL 5234231, at *8 (E.D.N.Y. Sept. 17, 2013) (internal quotation marks and citations omitted). Of significance: "[a]lthough intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 253).

28

Here, there is no dispute Plaintiff has established the first two elements of his prima facie case. First, as a Caucasian, Plaintiff is a member of a protected class. See Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 259 n. 9 (E.D.N.Y. 2005) ("[T]he Supreme Court has held that Title VII prohibits racial discrimination against whites on the same terms as racial discrimination against non-whites.") (citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279 (1976)). Second, as he is currently employed as a teacher, Plaintiff is qualified for his position. However, the parties dispute whether Plaintiff suffered an adverse employment action under circumstances giving rise to an inference of discrimination.

A fair reading of Plaintiff's submissions demonstrates his discrimination claim is based upon allegations of disparate treatment, i.e., Plaintiff was treated differently from similarly situated non-White teachers. (See generally Pl. Opp'n.) "A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." Ruiz, 609 F.3d at 493.

Establishing disparate treatment requires a reasonably close resemblance of the facts and circumstances of a plaintiff's case to that of his comparator's case, such that the comparator

29

"must be similarly situated to the plaintiff in all material respects." Abdul-Hakeem v. Parkinson, 523 F. App'x 19, 21 (2d Cir. 2013) (quoting Ruiz, 609 F.3d at 494). "Although the two positions need not be identical, they must be 'sufficiently similar' to support 'at least a minimal inference that the difference in treatment may be attributable to discrimination.'" Zheng-Smith v. Nassau Health Care Corp., 486 F. Supp. 3d 611, 622 (E.D.N.Y. 2020) (quoting Cutler v. Stop & Shop Supermarket Co., LLC., 513 F. App'x 81, 83 (2d Cir. 2013)). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards[,] and (2) engaged in comparable conduct." Abdul-Hakeem, 523 F. App'x at 21. Mere "speculation" as to similarity between coworkers is "insufficient to raise a genuine issue of material fact." Diggs v. Niagara Mohawk Power Corp., 691 F. App'x 41, 44 (2d Cir. 2017).

Based upon the summary judgment record presented, the evidence fails to support Plaintiff's claim that, because he was Caucasian, Plaintiff was treated differently from any similarly situated employee who was not Causasian. The Court elucidates, addressing Plaintiff's contentions of disparate treatment.

a.  The Alleged Lack of Assistance and Support

Plaintiff asserts he was not provided assistance and support from school administrators with regard to disruptive students. However, upon the summary judgment record, this

assertion does not support Plaintiff's disparate treatment claim. White contends that, when he "sent disruptive and violent students to Mr. Strachan for discipline, Plaintiff ended up being blamed for their behavior with the student not being disciplined and[/]or simply sent back to class and the incident not recorded." (Pl. Opp'n. at ECF p.10.) He argues students were rarely disciplined for "cursing out teachers, physically threatening teachers or causing general chaos in the classroom." (Id.) Plaintiff admitted issues regarding student misbehavior and lack of correctional discipline was a shared concern amongst the teachers in the building and was not specific to Plaintiff. (See Pl. Dep. Tr. 72:24-76:8; 82:14-22.) For example, Plaintiff testified about another teacher, Ms. Patty Benson, who believed a student she had removed from her classroom was returned too quickly. (Id. 73:19-74:14.) White also testified that a Black colleague, Lilas, also felt the administration was not providing him (Lilas) with sufficient support with respect to student discipline, e.g., not removing problem students quickly enough from the classroom. (Id. 75:9-76:8.) Even assuming, arguendo, Plaintiff was sufficiently similarly situated to Lilas, the evidence he proffers demonstrates the two experienced similar treatment, not different treatment; as such it fails to establish an inference of race-based discrimination. See, e.g., Henry v. NYC Health & Hosp. Corp., 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) ("A plaintiff may support an

inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably . . . ." (quoting <u>Norville v. Staten Island Univ. Hosp.</u>, 196 F.3d 89, 95 (2d Cir. 1999) (internal quotation marks omitted; further citation omitted)).

Moreover, Plaintiff also testified he could not recall a time when he requested assistance from either Strachan, Patton or Grey, but was refused assistance. (Def. 56.1 Stmt. ¶¶ 39-41 (citing Pl. Dep. Tr. 66:20-67:10, 68:22-69:6,70:10-23).) He did, however, claim that, in October 2012 and in front of the class, when he (White) asked security to remove a disruptive student from his classroom, Patton stated to him, "[S]ome teachers don't know how to handle our children." (<u>Id.</u> 62: 12-17, 117:3-11.) Then, upon the subsequent return of the removed student to the classroom, the student told White, "[Y]ou better watch yourself, Ms. Patton's got my back." (<u>Id.</u> 117:16-20.) Plaintiff's reliance upon this incident is misplaced. While Patton's comment may have been inappropriate, wholly lacking from the record is any link demonstrating Patton's comment was connected to Plaintiff's race. See <u>Acosta v. City of N.Y.</u>, No. 11-CV-0856, 2012 WL 1506954, *4 (S.D.N.Y. Apr. 26, 2012) ("[T]he <u>sine qua non</u> of a race-based discrimination or retaliation claim is that discrimination or retaliation was <u>because of race</u>." (emphasis in original)). Plaintiff's speculative and conclusory allegations are

32

insufficient to defeat summary judgment. See Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."); see also, e.g., Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

Further, Plaintiff claims that, in September 2012, he was disciplined for purportedly allowing a student to go to the cafeteria during class time, while an assistant teacher and security guard involved in that incident, both of whom were Black, were not disciplined. (See Pl. Opp'n. at ECF p.17.) However, the evidence demonstrates the student represented to the administration that it was Plaintiff who gave him permission to leave class, not the assistant teacher or security guard. (See Sept. 14, 2012 Memo from Trevor Patton, Ex. 8, attached to Pl.'s Extra Evidence Book.) First, Plaintiff has not articulated how he and the assistant teacher and/or the security guard were similarly situated. See, e.g., Sosa v. N.Y.C. Dep't of Educ., 368 F. Supp. 3d 489, 514 (E.D.N.Y. 2019) ("To the extent that disparate treatment is [plaintiff]'s means of alleging unlawful discrimination, the claims fail for an independent reason: []he has failed to allege that []he was similarly situated to those

33

employees []he alleges received more favorable treatment."). Second, even if Plaintiff had demonstrated the requisite similarity, regardless of the accuracy of what occurred, at bottom, Plaintiff has woefully failed to connect his reprimand versus the lack of reprimand for the assistant teacher and security guard to race; hence, as to this incident, Plaintiff again fails to show he was treated differently because of his race. See F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) ("To defeat a summary judgment motion, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" (citation omitted)); Acosta, 2012 WL 1506954, *4.

b.  No Section 3020-a Hearings for Others

Plaintiff contends he was similarly situated to Black teachers who were involved in disciplinary matters but, unlike him, were not subject to Section 3020-a hearings.[6] (Pl. Opp'n. at

---

[6]  Plaintiff also attempts to relitigate his Section 3020-a charges, arguing his Section 3020-a hearing was "corrupted," and certain testimony should have been excluded. (See Pl. Opp'n. at 132, 150; Pl. 56.1 Counter-Stmt. ¶¶ 264-81.) However, "[w]here a § 3020-a proceeding finds a plaintiff is guilty of certain misconduct, a plaintiff is precluded from both disputing the facts of those same incidences of misconduct and litigating the issue of whether a defendant had a legitimate reason to discipline a plaintiff." Clarke-Green v. N.Y.C. Dep't of Educ., No. 17-CV-0778, 2022 WL 4643385, at *20 (E.D.N.Y. Aug. 2, 2022) (citing Geer v. Gates Chili Cent. Sch. Dist., No. 17-CV-6161, 2021 WL 6015716, at

34

ECF pp. 23-25.)  However, the evidence discussed in further detail, infra, does not support Plaintiff's contention that his proffered comparators are similarly situated.

> "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably," but "[i]n order to make such a showing, the plaintiff must compare herself to employees who are 'similarly situated in all material respects.'" Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999) (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)); see also Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003); Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir.2000). "'[S]imilarly situated in all material respects does not mean all respects generally, but rather sufficiently similar 'to support at least a minimal inference that the difference of treatment may be attributable to discrimination.'" Hernandez v. City of New York, No. 11 Civ. 3521(SJ)(RER), 2013 WL 593450, at *4 (E.D.N.Y. Feb. 13, 2013) (quoting McGuinness v. Lincoln

---

\*14 (W.D.N.Y. Dec. 21, 2021) (giving preclusive effect to findings of hearing officer in plaintiff's § 3020-a proceeding, i.e., plaintiff was guilty of misconduct warranting his termination)); see also DePrima v. N.Y.C. Dep't of Educ., No. 12-CV-3626, 2014 WL 1155282, at *7 (E.D.N.Y. Mar. 20, 2014) (finding plaintiff was barred from relitigating claim alleging hearing officer came to improper conclusion in § 3020-a proceedings when claim had been raised and rejected in Article 75 proceeding).  Here, Plaintiff was represented by counsel during his Section 3020-a proceedings and appealed those findings to the state court.  Ultimately, the appellate court upheld the hearing officer's decision that Plaintiff engaged in inappropriate contact and that suspension was appropriate.  (See Def.'s 56.1 Stmt. ¶¶ 189-97.)  Plaintiff is precluded from re-arguing or otherwise challenging those findings here.

> Hall, 263 F.3d 49, 54 (2d Cir.2001)); accord
> Deras v. MTA, No. 11 Civ. 5912(RRM)(CLP), 2013
> WL 1193000, at *10 (E.D.N.Y. Mar. 22, 2013).

Henry, 18 F. Supp. 3d at 408.

First, Plaintiff claims, in October 2010, D.S., a Black teacher, was charged with misconduct for allowing students to talk and cheat during a final exam and for permitting students to wrestle in class resulting in a student being rendered unconscious. (See Pl. Ex. F, ECF No. 120 at ECF pp.121-27 (sealed).) However, on September 12, 2011, D.S. entered into a settlement agreement with the Defendant whereby D.S. waived his rights to a Section 3020-a hearing and agreed to resign effective June 30, 2013, while remaining on suspension with pay through that date. (Id.)

Second, Plaintiff proffers K.L., a Black teacher who, in December 2011, was charged with misconduct for making an inappropriate comment to a female student. (See Pl. Ex. G, ECF No. 120 at ECF pp.132-35 (sealed).) But, on December 13, 2011, K.L., entered into an agreement with the District subjecting him to a letter of reprimand in his file along with three weeks' unpaid suspension. (Id.) In doing so, he waived his right to a Section 3020-a hearing. (See id.)

Third, another of Plaintiff's alleged comparators, K.W., a tenured Black female teacher, was charged with misconduct on February 27, 2014; she was alleged to have graded her own students' Regents exams and, in doing so, increasing their grades. (See Pl.

Ex. H, ECF No. 120 at ECF pp.141-42.)  But, pursuant to a June 20, 2014 settlement agreement, K.W. was suspended without pay for a year, which suspension period was subsequently shortened to six months.  (Id. at ECF pp.147-48, 149-53.)

Thus, the record reflects Plaintiff's alleged comparators, unlike Plaintiff, were teachers who reached settlements with the Defendant and, therefore, were not subject to Section 3020-a hearings.[7,8]  Moreover and notably, similar to his

---

[7]  For completeness, the Court notes, as his deposition, Plaintiff identified another individual, Dupree Jones, who was a Black teacher in the Hempstead schools.  (See Pl. Dep. Tr. 141:6-142:11.) According to Plaintiff: Jones was suspended for two years, after which suspension he returned to teach; and there were no Section 3020-a charges brought against Jones.  (See id. 141:20-25.) Plaintiff testified that he mentioned Jones simply because Strachan was the principal who suspended Jones.  (See id. at 142:5-11.)  By virtue of being a teacher in a different school district, Jones is not sufficiently similarly situated in all material respects, see, e.g., Henry, 181 F. Supp. 3d at 408; therefore, Jones cannot be used as a comparator.

[8]  Plaintiff also points to Strachan and Spencer as comparators. As to Strachan:  Plaintiff argues Strachan was not disciplined for "forcefully dragging a female student out of the cafeteria and falling on top of her," and that he was accused of rape and plagiarism, but his only punishment was suspension for two weeks during the summer with pay.  (Pl. Opp'n. at ECF p.22.)  As to Spencer:  Plaintiff contends, "although Mr. Spencer had been accused of sexual misconduct with a student and a staff member at Roosevelt he was not investigated, not suspended, and did not have to pay a fine or lose money as a result of these accusations." (Id. at ECF p.27.)
"Under Second Circuit law, where a plaintiff seeks to make out a case of discrimination by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that he shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." Drummond v. IPC Int'l, Inc., 400 F. Supp. 2d 521, 532

alleged comparators, Plaintiff was also offered a suspension-in-lieu of a Section 3020-a hearing; significantly, though, it was because he declined the suspension-in-lieu settlement offer, that Plaintiff was subjected to a Section 3020-a hearing and not because he was Caucasian. (Def. 56.1 Stmt. ¶¶ 186-87.) This significant factual dissimilarity derogates Plaintiff's position that similarly situated employees of a different race were treated more favorably than was he. See Abdul-Hakeem, 523 F. App'x at 21 (affirming summary judgment in defendants' favor where "plaintiff failed to establish circumstances giving rise to an inference of discrimination on the basis of h[is] race in the absence of any evidence that []he was treated differently than similarly situated individuals who were not members of h[is] protected class").

    c.   Plaintiff's Evaluations and Schedule Changes

Plaintiff also contends he can demonstrate he was discriminated against given the poor and unsatisfactory evaluations he received from administrators Strachan and Spencer

---

(E.D.N.Y. 2005) (alteration in original) (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997))(alteration, internal quotation marks, and citation omitted); see also Davis v. Avaya, Inc., 295 F. App'x 380, 382 (2d Cir. 2008) (summary order) (upholding district court's grant of summary judgment where plaintiff "fail[ed] to make an adequate showing that similarly situated coworkers received disparate treatment"). Here, because Strachan and Spencer were both administrators and not teachers, like Plaintiff, Plaintiff is unable to claim he is similarly situated in all material respects to either Strachan or Spencer.

in comparison to the evaluations he received from other administrators. (See Pl. Opp'n. at ECF p.8; Pl. Exs. J through Q.) The Court is unpersuaded because Plaintiff does not also argue that he suffered any adverse consequences after receiving either Strachan's or Spencer's evaluation. It is well-settled "negative performance evaluations" or "letters to file" "do not rise to the level of an adverse employment action where . . . they d[id] not trigger other adverse consequences, such as loss of pay." Sotomayor v. City of N.Y., 862 F. Supp. 2d 226, 255 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013); Browne v. City Univ. of N.Y., 419 F. Supp. 2d 315, 333–34 (E.D.N.Y. 2005) ("A negative evaluation alone, absent some accompanying adverse result such as demotion, diminution of wages, or other tangible loss, does not constitute an adverse employment action.").

Further, Plaintiff received negative evaluations from other administrators, as well. For example, on June 26, 2008, Plaintiff received a "needs improvement" evaluation from Principal Favth Vaughn-Shavuo, noting White needed to consistently enforce the discipline code. (Def. 56.1 Stmt. ¶¶ 102; ECF No. 118-15.) Then, in December 2013, Plaintiff received an "unsatisfactory" rating from the middle school Principal, Nateasha McVea, and Assistant Principal, Ogechi Iwuoha. (See NYSDHR 2016 Decision at 6.) Yet, there is no evidence supporting Plaintiff's contention that these evaluations were related to his race.

39

For example, Spencer's 2019 observation report identified Plaintiff as "ineffective and developing." (Pl. 56.1 Response ¶ 95.)  He observed White's students were not paying attention in class (Def. 56.1 Stmt. ¶ 96) and, 10 out of the 18 students were on YouTube, on their phones, having unrelated conversations or listening to earbuds, all in violation of building policies. (Pl. Dep. Tr. 164:10-17.)  Plaintiff even testified, "I can't say that [Spender] gave me this evaluation because I'm white," as well as, "I can't say that I have heard him say anything about me being white.  I can't say that he has said anything in that regard." (Id. 166:6-15.)  Moreover, Plaintiff characterized other negative evaluations as "fair and accurate." (See id. 158-159:20-2; 159-160:22-4.)  Wholly lacking from the record is evidence that any evaluation of Plaintiff was based on his race.

Likewise, the fact that Plaintiff's schedule was changed after he returned from his suspension in November 2013 fails to support a discrimination claim. (See Pl. Opp'n. at ECF p.12; see also id. (arguing "receiving unfavorable schedules or work assignments" "demonstrate[s] the biased perspective these few administrators had against Plaintiff").)  Notwithstanding having been required to teach classes in two different buildings, which, arguably is inconvenient or even difficult, "receiving unfavorable schedules or work assignments do not rise to the level of adverse employment actions because they do not have a material impact on

the terms and conditions of [the] [p]laintiff's employment."
<u>Smalls v. Allstate Ins. Co.</u>, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005)). (citation omitted).   Further, "Title VII does not prohibit adverse employment actions motivated by personal biases; it forbids adverse employment actions <u>motivated by discrimination</u>."
<u>Sense v. Longwood Cent. Sch. Dist.</u>, 330 F. Supp. 3d 745, 771 (E.D.N.Y. 2018) (emphasis in original).   Thus, even assuming <u>arguendo</u> Spencer and Strachan had personal biases against White, <u>see</u> <u>id.</u>, because Plaintiff has not introduced any evidence that these administrators' alleged ill-will towards White was <u>motivated by discrimination</u>, and even assessing the facts in the light most favorable to Plaintiff, no reasonable juror could conclude White was treated differently because of his race.[9]

     Accordingly, as to Plaintiff's Title VII discrimination claim, Defendant's are entitled to summary judgment as a matter of law; hence its motion for summary judgment on this claim is GRANTED.

[Proceed to next page.]

---

[9] So too and without more, does Plaintiff's contention that, under the direction of Strachan, he was initially denied keys to his new classroom and to the facilities, fail to demonstrate discrimination. (<u>See</u> Pl.'s 56.1 Response ¶ 104.)  Plaintiff offers no evidence demonstrating these actions were motivated by his race; therefore, he is unable to make out a <u>prima facie</u> case of discrimination pursuant to Title VII.

2.   The Hostile Work Environment Claim

Title VII is violated when, due to an employees' race, religion, sex, or national origin, "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)[10] (citation and quotation marks omitted); see also Littlejohn v. City of N.Y., 795 F.3d 297, 320–21 (2d Cir. 2015).  To prevail on a hostile work environment claim, a plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Fox v. Costco Wholesale Corp., 918 F.3d 65, 74 (2d Cir. 2019) (citation omitted).  The standard for establishing a hostile work environment is high, see Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003), and a claim cannot be based upon speculative or conclusory allegations.  See Thomas v.

---

[10]   Harris was a case involving claims of gender-based harassment. However, "[g]enerally, the same standards apply to both race-based and sex-based hostile environment claims." Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 436 n.2 (2d Cir. 1999) (citing Torres v. Pisano, 116 F.3d 625, 630 (2d Cir. 1997) (noting the standards for evaluating hostile environment claims are the same whether the alleged discrimination is based on race or sex); Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986) (applying sexual harassment case law in case involving Title VII racial harassment)).

Bergdorff Goodman, Inc., No. 03-CV-3066, 2004 WL 2979960, at *6-7 (S.D.N.Y. Dec. 22, 2004).

Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." Harris, 510 U.S. at 21; see also Fox, 918 F.3d at 74 (same). "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'" Fox, 918 F.3d at 74 (quoting Harris, 510 U.S. at 23); see also Thomas, 2004 WL 2979960, at *6 (same). The incidents in question "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted).

Although hostility of a work environment is assessed considering the "totality of the circumstances," Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007), "[i]t is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano, 294 F.3d at 377; see also Thomas, 2004 WL 2979960, at *6 ("For a hostile work

environment to be actionable, there must be a link to plaintiff's membership in a protected class.  In other words, the hostile work environment must be the result of discriminatory animus.  Work environments that are hostile for non-discriminatory reasons do not fall within the ambit of Title VII.").  In other words, to succeed on his hostile work environment claim, Plaintiff must "demonstrate that []he was subjected to the hostility because of h[is] membership in a protected class." Brennan v. Metro. Opera Ass'n Inc., 192 F.3d 310, 318 (2d Cir. 1999); see also Alfano, 294 F.3d at 374 (instructing, to establish a claim of hostile work environment under Title VII, one must demonstrate the complained-of conduct occurred because of plaintiff's protected status, e.g., race).    Finally, personal animus without evidence of discriminatory bias on the basis of a protected class is insufficient to establish a hostile work environment claim.  See Lennert-Gonzalez v. Delta Airlines, Inc., No. 11-CV-1459, 2013 WL 754710, at *8 (S.D.N.Y. Feb. 28, 2013); see also Alfano, 294 F.3d at 377 ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").

44

Here, Plaintiff contends he was subject to "racially hostile actions," created and perpetuated by an "all-black administration" against white teachers, including racial taunts, name calling, multiple and alternating room assignments, being denied keys to his classroom and facilities, and a lack of student discipline. (See Pl. Opp'n. at ECF p.8.) But Plaintiff's proffered evidence consists of the same conclusory and speculative allegations this Court found to be unactionable for purposes of his disparate treatment claim.

For example, Plaintiff, who's surname is "White", contends three members of the school's security staff referred to him as "Whitey", "my white 'N' word", and "white man", and would say "yo, N-word" when they saw him. (Def. 56.1 Stmt. ¶¶ 59, 61-62; 66-68.) As to one of the security guards, known as "Senior", although Plaintiff saw Senior on a sporadic basis, when they encountered each other, Senior frequently called Plaintiff "Whitey". (Pl. 56.1 Counter-Stmt. ¶ 59; see also Pl. Opp'n. at ECF p.14.) Regardless, Plaintiff never told any of the security guards that he found their comments offensive. (Def. 56.1 Stmt. ¶¶ 69-70; Pl. 56.1 Response ¶¶ 64, 69.) Moreover, Plaintiff testified he did not believe the security guards were making the comments to be derogatory towards him, but that they liked him. (Def. 56.1 Stmt. ¶¶ 65, 71.) One security guard even spoke highly of Plaintiff to Strachan asserting Plaintiff was the best teacher

in the school.    (Pl. 56.1 Response ¶ 72.)    Given Plaintiff's surname is "White", without more, the Court is hard-pressed to conclude the security guards' use of the apparent nickname "Whitey" was disparaging or based upon discriminatory animus.    Yet, even when considered in conjunction with the other names the security guards used to greet Plaintiff, and even assuming, arguendo, those names were used in a discriminatory manner, such sporadic comments made by non-supervisory employees cannot be characterized as sufficiently "severe" or "pervasive" to state a hostile work environment claim.    See Curcio v. Roosevelt Union Free Sch. Dist., No. 10-CV-5612, 2012 WL 3646935, at *11 (E.D.N.Y. Aug. 22, 2012) ("Comments made at irregular intervals, over such a long period of time, particularly by individuals who did not exercise any direct supervisory authority over plaintiff, cannot serve as the basis of a hostile work environment claim."); Augustin v. Yale Club of N.Y.C., No. 03-CV-1924, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding "the infrequent and sporadic nature of the remarks at issue, over the course of five years, insufficient, as a matter of law, for [p]laintiff to maintain a hostile work environment claim"), aff'd, 274 F. App'x 76 (2d Cir. 2008) (summary order); Zheng-Smith, 486 F. Supp. 3d at 624 ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) are generally insufficient to sustain a hostile work environment claim." (internal quotations and citation omitted)).

Similarly, Plaintiff's reference to isolated comments made by co-workers is also insufficient to sustain his hostile work environment claim. In one instance, a fellow white teacher yelled and cursed at him after Plaintiff raised questions about who had graded a student's test. (Def. 56.1 Stmt. ¶ 73; Pl. 56.1 Response ¶ 74.) Admittedly, this incident was not related to Plaintiff's race. (Def. 56.1 ¶ 74.) Moreover, "where the plaintiff and the individual whose conduct is at issue are members of the same protected class, [as here], the inference that the conduct constitutes harassment or discrimination is weakened." Waters v. Gen. Bd. of Global Ministries, 769 F. Supp. 2d 545, 554 (S.D.N.Y. 2011) (collecting cases). Similarly, the observation by a fellow white teacher, Mr. Block, i.e., to "think about it, like your name is an insult around here" (Def. 56.1 Stmt. ¶¶ 75, 76), fails to support Plaintiff's claim of a racially hostile work environment. Nor does another employee reporting to Plaintiff that she heard Strachan and Patton refer to Plaintiff as "white man" in 2010 and again in 2013 or 2014 enough to maintain his hostile work environment claim based upon race. (Def. 56.1 Stmt. ¶ 83; Pl. 56.1 Response ¶ 84.) Rather, such a statement is hearsay, and generally, "inadmissible hearsay is . . . not to be considered on a motion for summary judgment." Mosby v. William Floyd Union Free Sch. Dist., No. 04-CV-4242, 2009 WL 10701906, *4 (E.D.N.Y. Mar. 31, 2009), aff'd, 363 F. App'x 788 (2d Cir. 2010). The same

47

holds true regarding Plaintiff's claim that Finch told him "administrators including Mr. Strachan were 'after' [Plaintiff]" (Pl. Opp'n. at ECF p.28); such hearsay evidence does not warrant granting Plaintiff summary judgment as a matter of law on his racially based hostile work environment claim. See, e.g., Jean-Pierre v. Citizen Watch Co. of Am., Inc., No. 18-CV-0507, 2019 WL 5887479, at *14 n.11 (S.D.N.Y. Nov. 12, 2019) (noting, where plaintiff never heard defendant use the word "nigger", plaintiff could not rely upon allegation of defendant's use of word to assert a hostile work environment claim (citations omitted)). Nonetheless, even if the Court were to accept these statements as admissible evidence, Plaintiff still would not have established a hostile work environment. Considered in their totality, these comments are simply not severe and pervasive enough to rise to the level of an actionable hostile work environment. See, e.g., Longmire v. Wyser-Pratte, No. 05-CV-6725, 2007 WL 2584662, at *12 (S.D.N.Y. Sept. 6, 2007) (sporadic alleged racist jokes and comments were not sufficient to warrant trial on plaintiff's hostile work environment claim).

Nor is Plaintiff's claim that Lilas, a Black fellow teacher, who called Plaintiff an "asshole" and referred to him as "white man" (Pl. 56.1 Response ¶ 87; Pl. Dep. Tr. 125:3-12), sufficient to create a genuine dispute of material fact. Plaintiff testified he did not know whether Lilas was calling him an asshole

48

"entirely because [he's] white" or whether "[h]e's just calling me an asshole." (Pl. Dep. Tr. 128:21-129:9.)  "[U]sing profanity to refer to a co-worker," while offensive, "does not rise to the level required to demonstrate a discriminatory hostile work environment." <u>Kodengada v. IBM</u>, 88 F. Supp. 2d 236, 243 (S.D.N.Y. 2000); <u>Small v. New York</u>, No. 12-CV-1236S, 2017 WL 1176032, at *5 (W.D.N.Y. Mar. 30, 2017) ("A few isolated incidents of boorish or offensive use of language are generally insufficient to establish a hostile work environment.") (collecting cases).[11]  Upon the summary judgment record presented, Plaintiff's exchange with Lilas is best described as "a clash of personalities rather than [] discriminatory animus." <u>Kodengada</u>, 88 F. Supp. 2d at 243.

At bottom, considering the totality of the circumstances, no reasonable juror could conclude that Defendant's conduct created a workplace so "permeated with discriminatory

---

[11]  Plaintiff claims he also heard Grey refer to him as "Whitey", but never told Grey that he (White) found this remark offensive or to stop. (Def. 56.1 Stmt. ¶¶ 80-81.)  Moreover, according to his testimony, Plaintiff and Grey "used to go out [and] used to chum together." (Pl. Dep. Tr. 119:24-120:3 ("I believed he liked me. But I don't know if he said it in a semi-derogatory way.").)  Not only is this not severe and pervasive enough to rise to the level of an actionable hostile work environment, but such speculative allegations are insufficient to sustain a Title VII claim. <u>See Thomas</u>, 2004 WL 2979960, at *5-7.  Further, Plaintiff has not claimed that Grey had anything to do with his suspension, and therefore his remarks are not probative of discriminatory intent. <u>See Sethi v. Narod</u>, 12 F. Supp. 3d 505, 543 (E.D.N.Y. 2014) ("Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent.").

intimidation, ridicule, and insult that [it] [was] sufficiently severe or pervasive to alter the conditions of the [Plaintiff's] employment and create an abusive working environment." Harris, 510 U.S. at 21; see Alfano, 294 F.3d at 376, 380 (vacating award for hostile work environment, because the "humiliating" and "plainly offensive" incidents were "too few, too separate in time, and too mild . . . to create an abusive working environment" and because no incident was "of such severity and character as to itself subvert the plaintiff's ability to function in the workplace").

Furthermore, even if the conduct complained of rose to the requisite level of severity or was otherwise pervasive, Plaintiff's claim of hostile work environment would still fail because, as discussed supra, Plaintiff fails to offer any evidence sufficient to show that the complained-of actions were taken because of Plaintiff's race as opposed to some other non-discriminatory reason. See Alfano, 294 F.3d at 374. "The anti-discrimination laws are not 'a general civility code,' and they do 'not prohibit all verbal or physical harassment in the workplace,' only that which is motivated by specified improper considerations." Smalls, 396 F. Supp. 2d at 372 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80–81, (1998)). Plaintiff's hostile work environment claim is based upon the same allegations as his discrimination claim, and like that claim,

Plaintiff's hostile work environment claim cannot survive summary judgment since he fails to offer any evidence demonstrating that he was "subjected to the hostility because of h[is] membership in a protected class." Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999). Thus, even drawing all factual inferences in favor of Plaintiff, with respect to Plaintiff's hostile work environment claim, the Court finds Defendant is entitled to judgment as a matter of law.

### 3.  The Retaliation Claim

Though his Amended Complaint appears to base Plaintiff's retaliation claim on the same allegations as his discrimination claims (see Amend. Compl. ¶¶ 48-50), in his Opposition, Plaintiff advances three grounds supporting his retaliation claim. First, Plaintiff's standing up to Superintendent Ross in a 2004 meeting (hereafter, the "2004 Ross Incident") resulted in: (a) his placement in a "rubber room"; (b) receiving his first ever unsatisfactory observation from Mr. Spencer; and (c) being denied a summer school position in 2005. (See Pl. Opp'n. at ECF pp.23-24, 25.) Second, Plaintiff's 2011 reporting to Strachan that a student physically attacked him, and Plaintiff's relatedly having that student sign an apology, i.e., the Candy Incident Statement, resulted in Section 3020-a charges being brought against Plaintiff, and, ultimately, Plaintiff being suspended (hereafter, the "Candy Incident Ramifications"). (See id. at ECF p.24.)

Third, Plaintiff's filing his December 2012 NYSDHR complaint resulted in unfavorable changes to his teaching schedule (hereafter, the "2012 NYSDHR Complaint Consequences"). (See id. at ECF p. 25.) For the reasons articulated, infra, none of the grounds advanced by Plaintiff supports his retaliation claim.

Like his discrimination claim, Plaintiff's retaliation claim is subject to the McDonnell Douglas burden shifting framework. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010). To make out a prima facie case of retaliation, a plaintiff must establish: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Id. (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).) "A protected activity is action that protests or opposes statutorily prohibited discrimination." Giscombe v. N.Y.C. Dep't of Educ., 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). Protected activities under Title VII include "informal complaints to supervisors, instituting litigation, or filing a formal complaint." Id. (internal quotation marks omitted).

For purposes of a retaliation claim, "[u]nlike in discrimination claims, an adverse employment action 'need not affect the terms and conditions of a plaintiff's employment.'"

Sotomayor, 862 F. Supp. 2d at 261 (quoting Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 n.1 (2d Cir. 2010)). Instead, such an action includes "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)); Pothen v. Stony Brook Univ., 211 F. Supp. 3d 486, 497 (E.D.N.Y. 2016) ("For a Title VII retaliation claim, plaintiff need only show that the adverse action could . . . have dissuaded a reasonable employee in [the plaintiff's] position from complaining of unlawful discrimination." (internal quotation and citation omitted) (alteration in original)). Further, a plaintiff must do more than merely assert a protected activity played some role in the adverse employment action; he must establish the protected activity was the "but-for" cause of the challenged employment action. Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."); Vega, 801 F.3d at 90-91 ("It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." (citing Nassar, 570 U.S. at 362)).

Yet, "the but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . through temporal proximity." Id. at 91. "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted); see Zann Kwan, 737 F.3d at 844 (instructing the "but-for" standard for causation on a Title VII retaliation claim does not change the plaintiff's ability, at the prima facie stage on a summary judgment motion, to establish causation indirectly by way of temporal proximity).

Having delineated the applicable standard, the Court proceeds to address each of Plaintiff's three grounds for claiming discriminatory retaliation.

a.    The 2004 Ross Incident

Plaintiff's contention that in 2005 he received his first poor evaluation, was denied a summer school position, and was placed in a "rubber room" in retaliation for standing up to Superintendent Ross during a 2004 meeting is untimely. A timely filing of a charge with the EEOC is a prerequisite to any Title VII claim filed in federal district court. See 42 U.S.C. § 2000e-5(e). Under Title VII, a plaintiff must file a charge with the EEOC within 300 days from the date of any act of discrimination or retaliation. See Nat'l R.R. Passenger Corp. v.

54

Morgan, 536 U.S. 101, 114 (2002) ("[O]nly incidents that took place within the timely filing period are actionable."). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice, and each discrete act starts a new clock for filing charges alleging that act." Id. at 114. Plaintiff's claim that he was retaliated against in 2005 occurred seven years prior to Plaintiff's protected activity of filing a NYSDHR complaint in 2012. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001).[12] Therefore, this argument is unavailing.

### b.   The Candy Incident Ramifications

Plaintiff's claim that he would not have been suspended "but for" the fact of having reported the student attack on him does not support a retaliation claim because he fails to offer any evidence that his 2011 reporting to Strachan of C.V.'s physical

---

[12]   Notwithstanding that Slattery involved a retaliation claim pursuant to the Age Discrimination in Employment Act ("ADEA"), the Slattery Court stated it "analyze[s] a claim of retaliatory discharge under the familiar three-part burden shifting analysis that was also first set forth in McDonnell Douglas", id. at 94 (citations omitted), i.e., the same McDonnell Douglas standard which applies to retaliation claims under Title VII.

assault of him (White) was raised in opposition to any discriminatory practices. Indeed, the Court has previously rejected such contention. (See Case Docket, R & R, ECF No. 29, at 16-17 (recommending dismissing Plaintiff's retaliation claim because "White does not claim that he engaged in any activity where he opposed discriminatory practices taken against him or anyone else on account of race, color, or national origin"), adopted by Dismissal Order, ECF No. 33).) Upon review of the summary judgment record, the Court finds Plaintiff has failed to rectify this deficiency. Thus, in the absence of any evidence establishing the requisite predicate protected activity, Plaintiff's retaliation claim with respect to his Section 3020-a hearing fails as a matter of law.

c.    The 2012 NYSDHR Complaint Consequences

Finally, Plaintiff's claim that changes to his class schedule were made in retaliation for his having filed his December 2012 NYSDHR complaint is equally unavailing. Plaintiff claims his schedule was changed when he returned from his suspension in November 2013, which return was almost a full year after his having filed the December 2012 NYSDHR complaint. However, to support a retaliation claim, the time-period between the protected activity and the alleged adverse action must be "very close". Cunningham v. Consol. Edison Inc., No. 03-CV-3522, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (citing Clark County Sch. Dist. v.

Breeden, 532 U.S. 268, 273-74, (2001)). "[A] passage of two months between the protected activity and the adverse employment action seems to be the dividing line." Id. (collecting cases); see also Dickens v. Hudson Sheraton Corp., LLC, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (finding one year between filing discrimination charge and alleged retaliatory act too long), aff'd, 689 F. App'x 670 (2d Cir. 2017). Thus, Plaintiff's claims of retaliatory acts occurring eleven months after the filing of his December 2012 NYSDHR complaint are too attenuated in time to establish a causal connection between Plaintiff's protected activity and Defendant's alleged retaliatory conduct. Hence, even construing the facts in the light most favorable to Plaintiff, Plaintiff is unable to demonstrate the requisite causal connection needed to maintain a retaliation claim, thereby compelling the granting of summary judgment in Defendant's favor as to this claim.

   B.   The Section 1981 and 1983 Claims

      Both parties also move for summary judgment on Plaintiff's discrimination and retaliation claims brought pursuant to Sections 1981 and 1983.

      As an initial matter and as Plaintiff concedes (see Pl. Opp'n. at ECF p.26), Plaintiff's claims are untenable under Section 1981, as it is Section 1983 that "provides the sole cause of action available against state actors alleged to have violated [Section] 1981." Duplan v. City of N.Y., 888 F.3d 612, 619 (2d Cir. 2018);

see also Richardson v. Buckheit, No. 19-CV-8505, 2020 WL 5802291, at *4 (S.D.N.Y. Sept. 29, 2020) (dismissing Section 1981 claims against state actors).    Therefore, the Court will evaluate Plaintiff's discrimination and retaliation claims pursuant to Section 1983.

The relevant standards applicable to Title VII claims, discussed supra, also apply to Section 1983 equal protection claims.[13]  See, e.g., Patterson v. County of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) (citing Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir. 1996)).  However, a plaintiff seeking to assert claims against a municipality pursuant to Section 1983 must show the claimed violation of his constitutional rights was the result of a municipal policy or custom.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692-94 (1978) (discussing Section 1983); see also Carmody v. Vill. of Rockville Ctr., 661 F. Supp. 2d 299, 330 (E.D.N.Y. 2009) ("[W]here the defendant alleged to have discriminated or retaliated against an employee under Sections 1981 or 1983 is a municipality, a plaintiff must also demonstrate that the claimed violation of his or her constitutional rights occurred as a result of a municipal policy or custom.  This is the same standard for prevailing on a claim of municipal liability

_____

[13]  Plaintiff does not specify which constitutional or statutory rights form the basis of his Section 1983 action, but such claims are frequently pursued under the Equal Protection Clause of the Fourteenth Amendment.  See, e.g., Vega, 801 F.3d at 87.

under Section 1983, also known as a <u>Monell</u> claim." (citations omitted)).  Thus, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Monell</u>, 436 U.S. at 694.

Here, Plaintiff has not provided any evidence that the contested actions were done pursuant to a municipal policy or custom or that any of the alleged actions and decisions relating to him were attributed to a final policymaker.  At most, Plaintiff claims: "Principals are responsible for maintaining a safe and secure environment for teachers free of racial, hostile, and violent students from attacking them and threatening them and if they fail to do so they and their employer are liable."  (Pl. Opp'n. at ECF p.22.)  Notwithstanding Plaintiff's contention, that is not enough; the Second Circuit has held "a . . . principal does not have municipal policymaking authority for <u>Monell</u> purposes." <u>Agosto v. N.Y.C. Dep't of Educ.</u>, 982 F.3d 86, 101 (2d Cir. 2020) ("Even assuming [the principal]'s discipline, evaluations, and harassing behavior were final decisions, those acts did not set final municipal policy because [the principal] lacked policymaking authority under state law." (citing <u>Hurdle v. Bd. of Educ. of City</u>

of N.Y., 113 F. App'x 423 (2d Cir. 2004) (holding N.Y.C. superintendent's final decision to transfer a principal did not set municipal policy)). Because Plaintiff has not claimed he suffered discrimination or retaliation based upon a municipal policy or custom, Plaintiff's claims for municipal liability pursuant to Sections 1983 fail as a matter of law.[14] See Baeringer v. Plainview-Old Bethpage Cent. Sch. Dist., No. 23-CV-3557, 2024 WL 3161814, at *5 (E.D.N.Y. June 25, 2024) (in context of dismissal motion, in dismissing Monell claims against school district, concluding, as is Second Circuit precedent, principals are not final policymakers under Monell (collecting cases)). Accordingly, as a matter of law, Defendant is entitled to summary judgment on Plaintiff's Section 1983 claims.

[Proceed to next page.]

---

[14]  Plaintiff's equal protection claim parallels his Title VII claim. Courts consider Title VII and Section 1983 claims together. See Vega, 801 F.3d at 82 (stating the elements of a Section 1983 equal protection claim "are generally the same as the elements of" a Title VII claim "and the two must stand or fall together" (citing Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004)); Sotomayor, 862 at 251 ("To survive a motion for summary judgment, a plaintiff claiming discrimination under Title VII . . . and § 1983 must satisfy the tripartite burden-shifting test enumerated in McDonnell Douglas . . . ." (collecting cases)). Therefore, applying the same Title VII standards to Plaintiff's Section 1983 claims, for the reasons discussed supra, the Court finds Plaintiff's Section 1983 claims fail as a matter of law.

III. <u>Plaintiff's Cross-Motion for Summary Judgment</u>

The Court has also considered Plaintiff's Cross-Motion on its own merits. <u>See</u> <u>Morales v. Quintel Entrm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001). In doing so, the Court has applied the summary judgment standard articulated <u>supra</u>, and has drawn all reasonable inferences against Plaintiff, as the movant. <u>See</u> <u>id</u>. (citing <u>Schwabenbauer v. Bd. of Educ.</u>, 667 F.2d 305, 314 (2d Cir. 1981)). For the same reasons warranting granting summary judgment in Defendant's favor, as elucidated <u>supra</u>, <u>i.e.</u>, Plaintiff has failed to offer evidence sufficient to establish a <u>prima facie</u> case of discrimination, hostile work environment or retaliation, the Court finds denying Plaintiff summary judgment in his favor is equally compelled; hence, Plaintiff's Cross-Motion is DENIED.

IV. <u>Plaintiff's Request for Sanctions</u>

Finally, Plaintiff requests the Court impose sanctions upon Defendant and/or issue a default judgment against it for its alleged failure to turn over documents. (<u>See</u> Pl. Opp'n. at ECF pp.19, 30.) Regarding his sanction request, the Court recounts the following relevant procedural history.

On June 18, 2019, Plaintiff moved to compel the production of certain evidence (<u>see</u> ECF No. 61), which was granted in part and denied in part by Magistrate Judge Locke's July 9, 2019 Order. (<u>See</u> Minute Order, ECF No. 63.) In compliance with

Magistrate Judge Locke's Minute Order, on July 30, 2019, the parties entered into a confidentiality stipulation. (<u>See</u> ECF No. 65.) On October 15, 2019, Plaintiff notified the Court he had not received documents in response to certain discovery demands. (<u>See</u> ECF No. 66.) In its October 21, 2019 response, Defendant informed Plaintiff and the Court: it did not possess any responsive documents to those particular requests; it had produced approximately 100 pages of documents that were responsive to Plaintiff's requests; and, its recent production was in addition to thousands of pages of documents and materials previously provided. (<u>See</u> ECF No. 67.) In an October 24, 2019 scheduling order, the Magistrate Judge reminded the parties: "Motions to resolve discovery disputes must be made by letter in accordance with Local Civil Rules 37.1 & 37.3." (ECF No. 69.) Plaintiff never filed any such motion (<u>see</u> Case Docket, <u>in toto</u>), and as of April 14, 2020, all written discovery was completed. (<u>See, e.g.</u>, ECF No. 72.)

Now, four years later and in the context of cross-motions for summary judgment, Plaintiff contends Defendant failed to comply with Magistrate Judge Locke's July 9, 2019 Order. (<u>See</u> Pl. Opp'n. at ECF p.21 ("[M]any of the requested documents that were supposed to be compelled by Judge Steven I. Locke were never surrendered to Plaintiff. . . . [M]ost of the documents supplied by Defendants after the motion to compel have been falsely

62

represented and in some cases corrupted." (Id. at ECF p.23.) Plaintiff's complaint is woefully untimely and misplaced.

To begin: Plaintiff was advised by the Court that "[m]otions to resolve discovery disputes must be made by letter in accordance with Local Civil Rules 37.1 & 37.3." (ECF No. 69.) Plaintiff's having filed a prior motion to compel discovery underscores his understanding of what was required regarding discovery requests which he believed were not being properly addressed by his adversary. Yet, no further letter motion was filed by Plaintiff. (See Case Docket, in toto.) Nor does Plaintiff's status as a pro se litigant excuse him from the Magistrate Judge's clear, October 24, 2019 directive. See, e.g., Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) ("[P]ro se status does not exempt a party from compliance with relevant rules of procedural and substantive law." (citation omitted)); LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir. 1995) ("Although pro se litigants should be afforded latitude, . . . they generally are required to inform themselves regarding procedural rules and to comply with them . . . . This is especially true in civil litigation." (internal quotation marks and citations omitted)). Rather, Plaintiff should have pursued his discovery complaints before discovery closed. See Olin Corp. v. Lamorak Ins. Co., 517 F. Supp. 3d 161, 177 (S.D.N.Y. 2021) (denying sanctions where defendant failed to comply with the procedural

requirements of Rule 37 and Local Rule 37.1); <u>see also</u> <u>Aikens v. Rao</u>, No. 13-CV-1088S, 2015 WL 5919950, at *9 (W.D.N.Y. Oct. 9, 2015) (finding plaintiff "had plenty of time prior to the close of discovery to seek discovery from [d]efendants or to bring any discovery issues, including [d]efendants' alleged failure to turn over documents, to the Court's attention" (citing <u>Harper v. Henton</u>, No. 11-CV-0406, 2014 WL 1304594, *8 (S.D. Ill. 2014)); <u>Malik v. Falcon Holdings, LLC</u>, 675 F.3d 646 (7th Cir. 2012) ("[I]f defendants thought that plaintiffs had failed to perform their obligations under the rules, they should have asked the district judge for a sanction before discovery closed rather than waiting (as they did) until their motion for summary judgment."). Moreover, summary judgment is not the proper context for compelling the production of documents. <u>See</u> <u>In re Vanderveer Estates Holding, LLC</u>, 328 B.R. 18, 29 (Bankr. E.D.N.Y. 2005) ("It is inappropriate to bring a discovery dispute to the Court's attention for the first time in opposition to a summary judgment motion."). Therefore, Plaintiff's request for sanctions and/or a default judgment is DENIED.


[Remainder of page intentionally left blank.]

CONCLUSION

Accordingly, for the stated reasons, **IT IS HEREBY ORDERED** that Defendants Summary Judgment Motion (ECF No. 116) is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's Cross-Motion for Summary Judgment (ECF No. 120) is DENIED; and

**IT IS FURTHER ORDERED**, once judgment has been entered in favor of Defendant and against Plaintiff, the Clerk of Court is directed to CLOSE this case.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     February 19, 2025
           Central Islip, New York